HARRIS COUNTY V. J. W. HALL ET AL.

No. 8082. Decided June 16, 1943.
Rehearing overruled July 21, 1943.
(172 S. W., 2d Series, 691.)

*Dan W. Jackson,* Criminal District Attorney, *Conrad J. Landram,* Assistant District Attorney, *Lewis & Knipp* and *Ernest A. Knipp,* all of Houston, for petitioner.

The tax collector having directed and required his deputies in the discharge of their duties as such, to assess and collect a 50 cent fee for oaths administered in connection with affidavits on automobile "bills of sale" and 25 cents for all other oaths administered in connection with the registration, licensing and transfer of motor vehicles, and having required, merely by virtue of being their superior and principal, that they account for and pay over to him each day the aggregate of such fees, of which he assumed complete and unquestioned dominion, is liable to the county for the full amount of such collection in the same manner and to the same extent as other fees of office, regardless of whether they be authorized by law or not, and it was error for the Court of Civil Appeals to hold to the contrary. Biencourt v. Parker, 27 Texas 562; City of Dallas v. Street Railway Co., 95 Texas 268, 66 S. W. 835; Tarrant County v. Rogers, 104 Texas 224, 135 S. W. 110; Weber v. Rogan, 94 Texas 62, 57 S. W. 940.

*E. R. Campbell* and *Sam R. Merrill,* for respondent Hall, and *Albert P. Jones* and *Baker, Botts, Andrews & Wharton,* for respondent Hartford Accident & Indemnity Company, all of Houston.

Under the statute the collector was required to account for all fees collected in his official capacity, and the trial judge found that the fees herein contended for were not collected by the deputies in their official capacity. Walker v. Mann, 143 S. W. (2d) 152; Anderson v. Penix, 138 Texas 596, 161 S. W. (2d) 455; Merrell v. Timmons, 158 S. W. (2d) 278; 39 Texas Jur., 253.

MR. JUDGE BREWSTER, of the Commission of Appeals, delivered the opinion for the Court.

This is a suit by Harris County, petitioner, against J. W. Hall and Hartford Accident and Indemnity Company, respondents, to recover $58,510.15 alleged to be due by Hall to the county by reason of Hall's service as assessor and collector of taxes for Harris County during 1935, 1936, 1937, and 1938.

Hartford Accident and Indemnity Company was surety on Hall's bond. Trial before the court without a jury resulted in a judgment for the county for $412.70, which was affirmed by the Court of Civil Appeals at Galveston, 166 S. W. (2d) 729.

In its first amended original petition, the county sued for $10,510.15, which is claimed Hall collected as fees in his official capacity but did not account for and pay over to it. The items alleged were: (1) $8,209.50 collected for affidavits taken from applicants for duplicate license receipts, replacement license plates, and permits to install new motors, in connection with Hall's duties in the registration of motor vehicles, during 1935, 1936 and 1937; (2) $1,776.75 collected for taking acknowledgments to bills of sale to automobiles filed in Hall's office during 1935, 1936 and 1937; (3) $502.90 colected for tax statements issued by Hall during 1935, 1936 and 1937; and (4) $21.00 fees collected for official duties, of an "unknown nature," performed by him during the same years.

The remaining $48,000.00 of the county's demand was set out in a trial amendment, the elements of which, with the circumstances of its filing, will be more particularly noted later.

As to the claims asserted in the county's first amended original petition, it appears that on June 11, 1937, the county auditor of Harris County wrote Hall that there were rumors that Hall had been taking affidavits pertaining to motor vehicle registrations and transfers and collecting fees therefor, in many instances without the applicant appearing before the notary public purporting to take the affidavit; and that Hall was giving tax statements and taking payments therefor without making a proper accounting. The letter further stated that the auditor had no record of any reports or remittances in respect to the items mentioned. Then, citing applicable statutes giving him authority so to require, the auditor asked Hall's reply to the following:

"1. During the past two years what fees have been collected and retained by you in connection with affidavits incident to the issuance of automobile licenses, transfers, bills of sale, destroyed vehicles, or any other automobile services directly or indirectly?

"2. What fees if any have been collected by you or your assistants for other persons in connection with the business referred to in the preceding question? In this connection give

me the dates of receipt, the amounts of such fees, and the name of the person or persons for whom such fees were received if collected.

"3. Please give me a list showing the dates paid, the names of the persons to whom paid, and the amounts of payments of any fees such as enumerated in Item 2 which may have been paid to any persons not already officially reported.

"4. What fees have been collected by you or your deputies with respect to the issuance of delinquent tax statements or certificates, or work performed as an incident thereto, during the period of two years? In this connection, give me the dates received, the amounts, the persons to whom the checks were payable, and by whom paid. Also please indicate whether or not the amounts so paid were retained by the deputies to whom the payments or checks were made or were received and retained by you.

"5. If any payments were made by you from the funds accumulated in Item 4, please furnish me a list showing the dates paid, the names of the persons to whom the payments were made, and the amounts thereof.

"6. Please give me a complete list of any other fees, compensation, or emoluments which have been received by you for a period of two years not embraced in the above and not included in your monthly or annual reports of fees collected.

"7. Please give me a list of the amounts received and the disposal thereof for any fees collected for any person not enumerated above and not previously officially reported by you in the reports prescribed for that pupose."

The auditor's letter concluded:

"Pursuant to the authority vested in me by law I prescribe that the form of report of official fees or compensation received and retained by you, and of fees collected for other persons be reported on Form 107, and that said reports, whether they indicate collections or not be under oath."

On June 28, 1937, Hall replied to the above letter as follows:
"I transmit the report called for in your letter of June 11, 1937. I have endeavored to compile the report so as to conform specifically to the items as set out by you.

"Items 1, 2, 3, 4 and 6 are shown in the report and, I believe, are sufficiently clear so as not to warrant any further explanation in the accompanying letter.

"Under Item 5, no specific payments could be credited to the funds received under Item 4 as the amounts received from this source were kept as one fund together with receipts from Items 1 and 6. These funds were collected and pooled in what was known as the Notary Office Fund for the purpose of protecting the clerks in unavoidable mistakes, uncollectible checks, office expenses, insurance, etc. Disbursements were made from the total amount of these funds and not from any particular item collected.

"These funds were handled by Mr. Roy M. Fullerton, as custodian, and the balance shown in the report is in his custody.

"There is nothing to report under Item 7."

Hall's report was under oath and followed the outline prescribed by the auditor. Item 1 showed a total of $3,851.25, "as shown by daily record." Item 2 totaled $6,135.00, "Boyd T. Collier as shown by daily record." Item 3 showed that the Item 2 total had been paid to Boyd T. Collier. Item 4 showed forty-two collections totaling $502.90. Item 5 was not answered. Item 6 showed collections amounting to $21.00.

The first question for decision is Hall's accountability for the sums collected as shown in Items 1 and 2 of his account, that is, for $3,851.25 collected and retained by him "in connection with affidavits incident to the issuance of automobile licenses, transfers, bills of sale, destroyed vehicles, or any other automobile services directly," and for $6,135.00 collected by Hall and his deputies for Collier for the same services and paid to Collier as shown by Item 3. Hall contends that he is not accountable for these fees because they were not paid to him by virtue of his office. Both courts below sustained this contention.

It appears that Hall established a regular department in his office to handle registration and other business relating to motor vehicles, with six regular deputies assigned to the work, assisted by ten or more special deputies during rush seasons. He acquired each deputy to collect fifty cents for an affidavit to a bill of sale and twenty-five cents for all other affidavits. Each deputy was responsible for all collections made by him and was required to turn them in daily to one Fullerton, a deputy

of Hall's designated as Custodian. In case of a bill of sale, which the law then required to be executed in triplicate with one copy delivered to the applicant, the deputy completed the jurat at the time if he was a notary; if he was not, he had some other deputy who was a notary to complete it, so that delivery of the applicant's copy could then be made. If the affidavit was to some instrument other than a bill of sale, the deputy, whether a notary or not, would collect the fee, hang the instrument on a hook, and next morning would deliver both the fee and the instrument to Fullerton, who would then notarize the instrument. After February 1, 1936, the above procedure was continued except that one Collier, who operated a tax adjustment service, would come into Hall's office "usually every day" and complete the jurats to all instruments then on hand, except bills of sale. The purported affiants to these instruments, of course, did not appear before Collier, who, according to Hall's report, received $6,135.00 for that pretended service from February, 1936, to June, 1937. Surely it requires no writing to demonstrate that Collier performed no service to the applicants and was entitled to no fees, because all these jurats were utter nullities. Since Collier was not entitled to the fees, Hall could not give them to him unless they belonged to Hall, and they were not Hall's if they were fees of office.

 Art. 8, sec. 14, of the Texas Constitution, as amended in 1932, prescribes that the county assessor and collector of taxes shall perform all the deputies with respect to assessing property for the purpose of taxation and of collecting taxes as may be prescribed by the Legislature. Hall argues that he was not acting in his official capacity in collecting motor vehicle registration license fees because he was not collecting any *taxes*. It is unnecessary to decide whether he was collecting taxes in performing that service. The fallacy in Hall's argument is that it over looks the facts that the Legislature may impose upon a public officer duties additional to those prescribed in the Constitution, provided they are not inconsistent therewith and are not prohibited by the Constitution. First Baptist Church v. City of Fort Worth (Com. App.) 26 S. W. (2d) 196. By an act passed in 1917, which has since been many times supplemented and amended, the Legislature placed the registration of motor vehicles and the collection of license fees and other duties incident thereto in the hands of the tax assessors and collectors of the several counties. Art. 6675a et seq., Vernon's Anno. Civ. Stat. In fact, it has said that nobody but these officers or their duly appointed deputies shall be permitted to collect license fees in the registration and transfer of motor vehicles. Art. 6675a-

10a, ibid. The assessor and collector's performance of that duty is in no wise inconsistent with his duty to assess and collect taxes under Art. 8, sec. 14, of the Constitution, supra; it in no way disables him to do the latter; it is not prohibited by the Constitution. Therefore, we hold that all duties prescribed by the statutes to be performed by the tax assessor and collector with respect to the registration of mtor vehicles are official duties attaching to that office.

■ But Hall contends that prior to the 1941 amendment of Art. 7246a his office had no authority to take and certify the affidavits in question and that, therefore, his deputies in taking them were acting as notaries public and not as his deputies. It is true that in 1941 the Legislature did amend Art. 7246a by specially providing that in counties with a population of 500,-000 or more the assessors and collectors of taxes and their deputies should be empowered to administrer oaths and affidavits covering bills of sale and applications for transfer of motor vehicles, etc., and should be authorized to collect a fee of twenty-five cents for each such oath or affidavit, the same to be accounted for as a fee of office. However, we think that the assessor and collector already had that authority by virtue of Art. 7246a, prior to the above amendment, reading as follows: "The Assessor and Collector of Taxes, Sheriff, or Sheriff and Assessor and Collector of Taxes, are hereby authorized and empowered to adminster all oaths necessary for the discharge of the duties of their respective offices and to administer all oaths required for the transaction of business of their respective offices." Acts 1935, 44th Leg., p. 416, ch. 166, sec. 1. Section 2, of this act, recites that it was passed as an emergency measure because the officers referred to were not then allowed to administer *all oaths necessary for the transaction of the business of their offices.* Since the registration of motor vehicles had been made a duty of the assesor and collector, it follows that when ever an oath was necessary to the transaction of that business, the assessor and collector or his deputy had, the authority to administer it, under the Act of 1935, supra. That the Act of 1941 deals with the matter in more specific terms does not mean that the authority did not already exist under the broad language of the earlier statute.

■ Under any other conclusion, this case would present a strange situation. If Hall's deputies were acting in their capacities as notaries, rather than as deputies, when they affixed their jurats to the instruments under consideration, certainly they and not Hall were entitled to the fees collected therefor. Yet they asserted no claim to the fees but turned them over each day to

Fullerton, for Hall, as the office arrangement required. In other words, they recognized that they were acting as the agents of Hall. So, if Hall's contention is correct, the result is that a lucrative private business was set up in the courthouse with al expenses falling on Harris County and all receipts going to Hall. We cannot subscribe to any such proposition.

■ It is asserted, however, that these fees cannot be fees of office because it was not until the 1941 amendment to Art. 7246a, supra, that they were authorized to be collected. It is sufficient to observe that if these fees were collected without authority of law because the services should have been rendered gratis, it does no lie in Hall's mouth to say so. That is a matter which concerns ony the individuals who paid them.

■ It is suggested that whatever Hall collected in connection with the registration of motor vehicles belongs to the State highway department and not to Harris County. Be that as it may, it is not Hall's controversy, particularly since he makes no suggestion that he has remitted the fees in question to the State highway department.

Therefore, the county is entitled to judgment against Hall and his security for $9,986.25, being Items 1 and 2 as shown by his report, since it represents fees collected by him by virtue of his office, for which he is accountable under the terms of Art. 3891, R. S. 1925, as amended. (Art. 3891, Vernon's Anno. Civ. Stat.) See Nueces County v. Currington et al, 139 Texas 297, 162 S. W. (2d) 687.

■■ As to the county's claim for $502.90 for fees collected by Hall for tax statements, the county was awarded judgment for only $316.80, with interest on each item thereof from the date of its payment at 6 per cent per annum, which interest amounted to $95.90 at the date of the judgment. The trial court heard the testimony as to these transactions. After the case was closed he asked for a transcript of the evidence and later entered his judgment. That constituted a finding that Hall had collected only the charges for which recovery was allowed. Since there was a conflict in the evidence thereon, that finding is binding on us. But the county insists that Hall was bound by his report showing that he had collected the $502.90. If the report could be regarded as a judicial admission, that proposition would be sound. However, it belongs to that class known as extrajudicial admissions, which are not conclusive but are only part of the evidence, to be given such weight as the trier of the facts may

see fit to accord them. McCormick and Ray, Texas Law of Evidence, sec. 494, p. 632. Therefore, that part of the judgment is affirmed.

The trial court found against the county on the $21.00 shown in Hall's report as Item 6 and alleged to have been collected by him for official duties of an "unknown" nature, and the county makes no complaint at the finding.

We come now to the $48,000.00 demanded of respondents in the trial amendment. Trial of the cause asserted in the first amended petition began on November 12, 1941. On January 8, 1942, the county was permitted to file the trial amendment. That pleading alleged, in substance, that it had been discovered during the trial that approximately $48,000.00 of public funds belonging to Harris County had been deposited during 1935, 1936, 1937 and 1938, in a bank, other than the county depository, in the name, of Fullerton; that this fund was made up of fees collected by Hall for tax statements and certificates, of fees collected from taxpayers in making refunds of overpayments of taxes, and from "taxes and other funds collected from persons unknown"; and that none of it had ever been accounted for.

Fullerton testified in detail about this account. He said he used it more or less for exchange, particularly to make refunds on overpaid taxes. In explaining withdrawals therefrom of a private nature, which for Hall alone amounted to $11,510.30 from May 6, 1935, to June, 1937, Fullerton said that they were made for theaccommodation of patrons of the office and of persons working in the office in making remittances unrelated to the office. He said he would write a check on this account in favor of the one to whom the individual desired to make remittance and that the person thus accommodated would pay him the cash, which he in turn would deposit to the credit of the account. He testified that the $11,510.30 checked out for Hall, as above stated, that the $11,510.30 checked out for Hall, as above stated, was all repaid to him by Hall in cash and put back into the bank to the credit of the account. He said that all withdrawals for private purposes were thus repaid to him and put back into the account. He asserted that no public funds whatever were lost to the county through this method of handling the account.

In its brief the county presents an excellent argument on the weight to be given to this testimony, but with that we have nothing to do. It must be conceded that his manner of handling

public funds is not to be commended. Morever, the record reflects some inconsistencies in Fullerton's explanation. However, those were matters for the trial judge. He settled them by finding that Fullerton's testimony was true beyond "the slightest doubt" and, more specifically, that no public money was lost through this special account. That finding is binding on the appellate courts, hence the judgment of the trial court that the county take nothing on its trial amendment must be affirmed. This conclusion renders it unnecessary to decide whether limitation had run against this demand.

The judgment of the Court of Civil Appeals is reversed. The judgment of the trial court denying Harris County recovery of the total of $9,986.25 set forth in plaintiff's petition and in Hall's report as Items 1 and 2, is reversed, and the trial court is instructed to enter judgment therefor against the respondents and in favor of the county, with interest at six per cent per annum on each collection from the date of its receipt by Hall. In all other respects, the judgment of the trial court is affirmed.

Judgment of the Court of Civil Appeals reversed; judgment of the trial court affirmed in part, and reversed and rendered in part, with instructions.

Opinion adopted by the Supreme Court June 16, 1943.

Rehearing overruled July 21, 1942.